**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 Case No. |
|  | : |  |
| AMR CORPORATION, *et al.*, | : | 11-15463 (SHL) |
|  | : |  |
| Debtors. | : | Jointly Administered |
|  | : |  |

-----------------------------------------------------------------x

|  |  |  |
|---|---|---|
| U.S. BANK TRUST NATIONAL ASSOCIATION, | : |  |
| not in its individual capacity, but solely | : | Adversary Case No. 12-___ (SHL) |
| as Trustee and Security Agent under the | : |  |
| Indenture and Aircraft Security Agreement | : |  |
| for the American Airlines 2009-2 Senior | : |  |
| Secured Notes Due 2016, | : |  |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| AMERICAN AIRLINES, INC., | : |  |
|  | : |  |
| Defendant. | : |  |
|  | : |  |

-----------------------------------------------------------------x

**COMPLAINT FOR DECLARATORY JUDGMENTS**
**THAT AMERICAN AIRLINES, INC. IS OBLIGATED TO PAY THE MAKE-WHOLE**
**AMOUNT IN RESPECT OF THE 2009-2 SENIOR SECURED NOTES DUE 2016**
**AS A RESULT OF ITS VOLUNTARY REDEMPTION OF THE NOTES**

Plaintiff U.S. Bank Trust National Association ("U.S. Bank"), not in its individual

capacity but solely as Trustee and Security Agent under the Aircraft Agreements (as defined

herein) (the "Trustee" or the "Plaintiff"), by and through its undersigned counsel, pursuant to

direction from the Noteholders (as defined below), hereby files this Complaint against Defendant

American Airlines, Inc. ("American" or the "Defendant").  In support of the requested relief,

Plaintiff alleges with respect to its own acts, and on information and belief with respect to all other matters, as follows:

## NATURE OF THE ACTION

1.      Nearly eleven months into these chapter 11 cases, and ten months after having agreed – under section 1110(a) of the Bankruptcy Code – to cure and continue to perform the Debtors' obligations under the Indenture, the Debtors filed a motion seeking authority to refinance the 2009-2 Secured Notes Due 2016 (the "Notes") at par without paying the contractually required Make-Whole Amount.  See ECF No. 4959 (hereinafter, the "Motion").[1] While the Debtors style their request as consistent with the terms of the Indenture or otherwise consistent with sections 363 and 364 of the Bankruptcy Code, it is nothing of the sort.  What the Debtors are essentially seeking in the Motion is a declaration from this Court determining the extent of the Trustee's liens on the Aircraft Equipment, the Trustee's interests in Aircraft Equipment and the Aircraft Agreements, as well as the amount of the Trustee's secured claim, without commencing an adversary proceeding.

2.      Moreover, the Debtors expressly rely on language in Section 3.03 of the Indenture that "No Make-Whole Amount shall be payable on the [Notes] **as a consequence of or in connection** with an Event of Default or the acceleration of the [Notes]." (emphasis added). However, the Debtors admit that they are pursuing the proposed refinancing because the market environment has improved and would currently allow them to strategically refinance the Notes at lower rates.  This motivation has nothing to do with any "consequence" of the Debtors' bankruptcy filing and is in no way "connected to" the Debtors' bankruptcy filing.

---

[1]  All other terms not defined herein shall have the meaning ascribed to them in the Indenture (as defined herein).

3.      Permitting a refinancing through a voluntary redemption without payment of a Make-Whole Amount is inconsistent with the Indenture's plain language and underlying logic. Voluntary Redemptions are governed by Section 2.20 of the Indenture, which unambiguously requires payment of a Make-Whole Amount.

4.      Predictably, the Debtors argue that their bankruptcy filing triggered an automatic acceleration, thereby purportedly accelerating the maturity date of the Notes and allegedly eliminating any obligation to pay the Make-Whole Amount.  This purported automatic acceleration, however, is not only waivable by the Trustee (at the direction of the Noteholders), but is also an unenforceable *ipso facto* clause.  Section 2.20 of the Indenture, which governs Voluntary Redemptions, specifically requires payment of a Make-Whole Amount in such case if the Notes are voluntarily redeemed "at any time," the definition of "Make-Whole Amount" contemplates a process for calculating payment after an event of default occurs and none of the Indenture provisions cited by the Debtors in the Motion or applicable law contradict these fundamental points.

5.      Additionally, the Debtors have made an affirmative agreement under section 1110(a) of the U.S. Bankruptcy Code ("Section 1110") to cure all defaults, other than *ipso facto* defaults, and "perform all obligations" under the Aircraft Agreements.  As a consequence, the Debtors have obtained the benefits of the stay with respect to the Aircraft securing the Notes and by continuing to use the Aircraft (as defined below).  In addition, the Debtors have at all times acted as though the Notes have not been accelerated, and have paid all regularly scheduled installments of principal and interest since the Petition Date in connection with the 1110(a) Agreement (as defined below) as and when due.  The Debtors cannot, on the one hand, take the necessary steps to retain and operate the Aircraft Equipment during the bankruptcy by

performing under and in accordance with the Aircraft Agreements and, on the other hand, argue

ten months later that the Notes have been automatically accelerated. To the extent that the Notes

could be said to have been "accelerated" for purposes of the Make-Whole Amount as of the

Petition Date, the 1110(a) Agreement (including payment of regularly scheduled principal and

interest payment postpetition) and the Debtors' own actions have rendered the Notes decelerated.

6.      Accordingly, U.S. Bank, as the Trustee for the Noteholders, seeks a judgment

which, among other things, declares that American is obligated and required to pay the Make-

Whole Amount provided in the Indenture upon any redemption or refinancing of the Notes prior

to August 1, 2016 (the "Maturity Date"), and that the Make-Whole Amount is a Secured

Obligation under the Indenture.

## JURISDICTION AND VENUE

7.      The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

§§ 157 and 1138. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The statutory predicates for relief are 28 U.S.C. § 2201 and section 506 of the

Bankruptcy Code. This adversary proceeding is a core proceeding pursuant to 28 U.S.C.

§§ 157(b)(2)(A), (B) and (O), and the Court may enter a final judgment as to the merits of this

case.

## PARTIES

9.      Plaintiff U.S. Bank, as Trustee and Security Agent for the Noteholders, is a

national banking association organized under the laws of the United States. Its main office is in

Wilmington, Delaware.

10.     Defendant American Airlines, Inc. is a Delaware corporation with its principal

place of business in Fort Worth, Texas. American is the principal subsidiary of AMR Corp.

4

("AMR," and together with American and its debtor affiliates, the "Debtors"), another debtor in

the chapter 11 cases currently pending in this Court.

## FACTUAL BACKGROUND

11.     U.S. Bank serves as Trustee and Security Agent in connection with (i) that certain

Indenture and Security Agreement between American and U.S. Bank, as Trustee, dated as of July

31, 2009 (as amended, restated, supplemented or otherwise modified from time to time in

accordance with its terms, the "Indenture"), and (ii) that certain Aircraft Security Agreement by

and among American Airlines, Inc. (and any supplement related thereto) and U.S. Bank, as

Trustee and Security Agent (the "Aircraft Security Agreement," and together with the Indenture

and all other related transaction documents, collectively the "Aircraft Agreements"), pursuant to

which the Notes were issued.  The Aircraft Agreements are attached hereto as Exhibit A.

12.     The Debtors comprise one of the premier flagship airlines in the United States.

According to the Affidavit of Isabella D. Goren [ECF No. 4] (the "First Day Affidavit"), filed on

the Petition Date (as defined below) on behalf of AMR Corporation, as of "November 1, 2011,

the Debtors had a fleet of 600 jet aircraft and provided approximately 1,800 scheduled daily

departures to approximately 160 destinations throughout North America, the Caribbean, Latin

America, Europe and Asia."  First Day Affidavit, No. 4 ¶ 5.

13.     Substantially all of the aircraft operated by the Debtors are financed through

"operating leases, capital leases, private bank mortgages, and publicly-issued secured debt

instruments."  Id. ¶ 12.  Included among these financing instruments are the Notes.

## THE NOTES AND THE INDENTURE

### General Background

14.     American issued the Notes pursuant to the Indenture on July 31, 2009 in order to

refinance prior aircraft financing agreements that were scheduled to mature.  As reported in

AMR's public filings, American disclosed:

> On July 31, 2009, American closed a $276 million private placement offering of
> senior secured notes due 2016 (2009-2 Secured Notes), which were priced at par
> to yield 13 percent.  The purpose of the offering was to refinance, in part, the
> outstanding $401 million principal amount of the Company's 1999-1 enhanced
> equipment trust certificates (1999 EETC).  The Company deposited the net
> proceeds from the offering as cash collateral to secure the 2009-2 Secured Notes
> and such proceeds are recorded in Other assets.  Following the payment of the
> 1999-1 EETC at maturity on October 15, 2009, 12 of the 15 aircraft that
> previously secured the 1999 EETC were pledged to the 2009-2 Secured Notes,
> and the cash collateral was released the Company.

AMR Corp., Quarterly Report (Form 10-Q), at 10 (Oct. 21, 2009).

15.     As of September 30, 2012, $174,163,156 of the initial $276 million of Notes,

without including accrued interest, remained outstanding.

16.     The Notes are secured by twelve Boeing aircraft, consisting of three types of

aircraft used in American's fleet – including two (2) Boeing 777-223ERs, nine (9) 737-823s and

one (1) 767-323ERs (each an "Aircraft" and collectively together with each Aircraft's engines,

related equipment and/or other equipment, documents, insurance, requisition proceeds and

records with respect to the Aircraft Agreements, the "Aircraft Equipment").  Upon information

and belief, the Boeing 777-223ERs in American's fleet are utilized for long-haul international

routes to destinations including São Paulo and London-Heathrow, some of the most profitable

routes flown by American.  The 737-823s in American's fleet are a significant part of one of

American's fleet modernization programs, and these aircraft fly many routes throughout

American's system.  The Boeing 767-323ERs in American's fleet are flown primarily on

American's highly profitable non-stop transcontinental flights from New York-JFK to San Francisco and Los Angeles.

17.     The Notes were initially issued and privately placed as unregistered securities, but were then registered with the Securities and Exchange Commission and publicly offered for sale to institutional investors.  The Notes have been publicly traded ever since.

**The Aircraft Agreements Require American to Pay the Make-Whole Amount Upon a Voluntary Redemption**

18.     Schedule I to the Indenture provides that the Maturity Date of the Notes is August 1, 2016.  Schedule II to the Indenture sets forth the Payment Dates and amortization schedule with respect to the Notes.  The Payment Dates are February 1 and August 1 of each year, with the final Payment Date being the Maturity Date.  See Indenture at Schedule II.  Section 2.07(a) of the Indenture provides that each of the Notes will bear interest as provided for in the Indenture on the unpaid principal amount of such Note until such principal amount has been paid in full. Section 2.07(b) of the Indenture provides that the principal amount of each Note shall be payable in installments on the Payment Dates set forth in Schedule II to the Indenture, with the final Payment Date being the Maturity Date.

19.     The Indenture provides that the Notes may not be redeemed by the Debtors or voluntarily prepaid except pursuant to the Voluntary Redemption provision in Section 2.20 of the Indenture.  In the event the Debtors voluntarily redeem the Notes, Section 2.20 of the Indenture provides that the Debtors would be required to pay all outstanding principal and accrued interest, plus the Make-Whole Amount.  Section 2.20 of the Indenture provides, in pertinent part:

> Voluntary Redemption of Notes.  All, but not less than all, of the Notes may be redeemed by the Company *at any time*. . . and such Notes shall be redeemed in whole at a redemption price equal to 100% of the unpaid principal amount thereof, together with accrued and unpaid interest thereon to (but excluding) the date of redemption and all other Secured Obligations owed or then due and payable to the Noteholders, ***plus Make-Whole Amount***, if any.

7

Indenture § 2.20 (emphasis added).

20.     In marketing the Notes, American acknowledged that, if it sought to redeem the

Notes prior to the Maturity Date, it would be required to pay the Make-Whole Amount.  In the

Registration Statement for the Notes, filed with the Securities and Exchange Commission on

September 3, 2009, American represented:

> *Optional Redemption*.  American may elect to redeem all, but not less than all, of
> the Notes at any time prior to the Scheduled Maturity Date.  The redemption price
> will be the unpaid principal amount of the Notes, together with accrued and
> unpaid interest thereon, plus the Make-Whole Amount (if any).

American Airlines, Inc., Registration Statement (Form S-1), at 12, 38 (Sept. 3, 2009).  The

Registration Statement defines the "Scheduled Maturity Date" as August 1, 2016.  Id. at 3.

21.     The Make-Whole Amount is intended to provide a reasonable estimation of the

amount that would have been realized by the Noteholders if such Notes had remained

outstanding until their scheduled maturity.  The Indenture defines the Make-Whole Amount, in

pertinent part, as:

> with respect to the Notes or any Allocable Portion of the Notes, the amount (as
> determined by an independent investment banker selected by the Company (and,
> following the occurrence and during the continuance of an Event of Default,
> reasonably acceptable to the Trustee)), if any, by which (i) the present value of the
> Remaining Scheduled Payments with respect to the Notes or such Allocable
> Portion computed by discounting each such Remaining Scheduled Payment on a
> semiannual basis from its respective Payment Date (assuming a 360-day year of
> twelve 30 day months) using a discount rate equal to the Treasury Yield plus the
> Make-Whole Spread exceeds (ii) the outstanding principal amount of the Notes or
> such Allocable Portion plus accrued but unpaid interest thereon to the date of
> redemption.

Indenture Annex A.

22.     This definition specifically contemplates a Make-Whole payment after an Event

of Default occurs.  Id.  For purposes of determining the Make-Whole Amount, the "Remaining

Scheduled Payments" means the remaining scheduled payments of principal and interest

8

"following the redemption date to, and including, the Maturity Date." Id. The "Treasury Yield"

is defined to mean the interest rate as determined according to a specified calculation. Id.

Definitions relating to the calculation of the Make-Whole Amount are contained in Indenture

Annex A (beginning at A-12).

23.     The Indenture provides that the Secured Obligations include the Make-Whole

Amount. Indenture § 2.27.

**Events of Default Under the Indenture**

24.     The Indenture specifies a number of events constituting a default by American. In

addition to other specified events, the Indenture provides that the filing by American for

protection under the Bankruptcy Code constitutes an Event of Default:

> Events of Default. Each of the following events shall constitute an "Event of
> Default" whether such event shall be voluntary or involuntary or shall come about
> or be effected by operation of law or pursuant to or in compliance with any
> judgment, decree or order of any court or any order, rule or regulation of any
> administrative or governmental body and each such event of Default shall be
> deemed to exist and continue so long as, but only so long as, it shall not have been
> remedied or explicitly waived:
> * * *
> (g)     the Company shall file a voluntary petition in bankruptcy or a voluntary
> petition or an answer seeking reorganization, liquidation or other relief as a debtor
> in a case under any bankruptcy laws or insolvency laws (as in effect at such time)
> or an answer admitting the material allegations of a petition filed against the
> Company as a debtor in any such case, or the Company shall seek relief as a
> debtor, by voluntary petition, answer or consent, under the provisions of any other
> bankruptcy or other similar law providing for the reorganization or winding-up of
> corporations (as in effect at such time), or the Company shall seek an agreement,
> composition, extension or adjustment with its creditors under such laws;

Indenture § 4.01.

25.     Upon the occurrence of an Event of Default, so long as the specified Event of

Default is unremedied and continuing, the Trustee is given the ability to seek to exercise

remedies. In particular, the Indenture provides:

If an Event of Default shall have occurred and be continuing and so long as the same shall continue unremedied, then and in every such case the Trustee may, and upon the written instructions of a Majority in Interest of Noteholders, the Trustee shall do one or more of the following to the extent permitted by, and subject to compliance with the requirements of, applicable law then in effect:

(i)        declare by written notice to the Company all the notes to be due and payable, whereupon the aggregate unpaid principal amount of all Notes then outstanding, together with accrued but unpaid interest thereon and all other amounts due thereunder (but for the avoidance of doubt, without Make-Whole Amount) shall immediately become due and payable without presentment, demand, protest or other notice, all of which are hereby waived, provided that an Event of Default referred to in Section 4.01(f), Section 4.01(g), Section 4.01(h) or Section 4.01(i) shall have occurred and be continuing, then in every such case the unpaid principal amount of the Notes then outstanding, together with accrued but unpaid interest thereon and all other amounts due thereunder (but for the avoidance of doubt, without Make-Whole Amount), shall immediately and without further act become due and payable without presentment, demand, protest or notice, all of which are hereby waived; and, following such declaration or deemed declaration:

(ii)       if the Aircraft Security Agreement shall have been entered into pursuant to Section 1.03(c), instruct the Security Agent to take any action pursuant to Section 4.02 of the Aircraft Security Agreement in accordance with the terms thereof and of applicable law; or

(iii)      exercise any other remedy of a secured party under the Uniform Commercial Code of the State of New York (whether or not in effect in the jurisdiction in which enforcement is sought) with respect to the Pre-funded collateral.

Indenture § 4.02(a).

26.      The Indenture provides that, to the extent that any proceedings to enforce any right, power or remedies were instituted but discontinued, the parties will be returned to their former positions.  Section 4.04 of the Indenture provides:

In the case the Trustee shall have instituted any proceedings to enforce any right, power or remedy under this Indenture by foreclosure, entry or otherwise, and such proceedings shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Trustee, then and in every such case the Company and the Trustee shall, subject to any determination in such proceedings, be restored to their former positions and rights hereunder with respect to the Pre-funded Collateral, and all rights, remedies and powers of the Trustee shall

10

continue as if no such proceedings had been undertaken (but otherwise without prejudice).

Indenture § 4.04.

27.     Even assuming there had been an acceleration in the present circumstances without any action by the Trustee under the Indenture – which is not the case – the Trustee and the Noteholders would have the right to rescind any such acceleration and/or waive any Event of Default, rendering its impact null and void.  Accordingly, even if the Debtors' bankruptcy filing could be deemed an Event of Default, the Trustee would still have the right to waive any applicable default.

28.     Section 4.02 specifically gives the Trustee and the Noteholders discretion as to when, if ever, to enforce remedies under the Indenture if an Event of Default should occur. Further, and independently, Section 4.02(d) of the Indenture gives the Noteholders the right, by notice to the Debtors and the Trustee, to rescind and annul any acceleration of the Notes, specifically including the sort of acceleration provided for in Section 4.02(a)(i) (which includes an acceleration upon the event of a bankruptcy filing):

> Rescission and Annulment of Acceleration. At any time after the Trustee has declared the unpaid principal amount of all Notes then outstanding to be due and payable, or all Notes shall have become due and payable as provided in the proviso to Section 4.02(a)(i), and, in either case, prior to the sale of any part of the Collateral pursuant to this Article IV or pursuant to Article IV of the Aircraft Security Agreement, a Majority in Interest of Noteholders, by written notice to the Company and the Trustee, may rescind and annul such declaration, whether made by the Trustee on its own accord or as directed or deemed declaration, and its consequences if: (i) there has been paid to or deposited with the Trustee an amount sufficient to pay all overdue installments of principal amount of, and interest on, the Notes, and all other amounts owing under the Operative Documents, that have become due otherwise than by such declaration of acceleration and (ii) all other Events of Default, other than nonpayment of principal amount or interest on the Notes that have become due solely because of such acceleration, have been either cured or waived; provided that no such rescission or annulment shall extend to or affect any subsequent default or Event of Default or impair any right consequent thereon.

Indenture § 4.02(d).

29.      The Indenture thus permits the Noteholders to rescind an acceleration of the Notes

pursuant to any Event of Default so long as two conditions are met.  First, the Debtors must be

current on their payments of principal and interest with regard to the Notes.  Second, any Events

of Default other than a default on payment of principal and interest on the Notes that have

become due solely because of acceleration must be waived.  As the Debtors have continued to

make scheduled payments in accordance with their obligations under the Indenture and the

1110(a) Agreement, each of these conditions can be met.  And, to the extent the Debtors violate

the 1110(a) Agreement, and fail to pay any amounts due under the Notes postpetition, the stay

will no longer apply and the Trustee can take enforcement actions in accordance with section

1110(a)(2)(B)(iii) and 1110(c)(1).

30.      In addition, Section 4.05 of the Indenture provides the Trustee with the right and

ability to waive an Event of Default.  In particular, the Indenture provides:

> A Majority in Interest of Noteholders by notice to the Trustee may authorize the
> Trustee to waive, and to instruct the Security Agent to waive, if applicable, any
> past Default hereunder or under any other Operative Document and its
> consequences, and upon any such waiver such Default shall cease to exist and any
> Event of Default (including, if applicable, any Event of Default that is an Aircraft
> Security Event of Default ) arising therefrom shall be deemed to have been cured
> for every purpose of this Indenture and the other Operative Documents, but no
> such waiver shall extend to any subsequent or other Default or impair any right
> consequent thereon; <u>provided</u> that in the absence of written authorizations from
> each of the affected Noteholders, the Trustee shall not waive, or instruct the
> Security Agent to waive, any Default or Event of Default (i) in the payment of the
> principal amount, Make-Whole Amount, if any, or interest due under any Note
> then outstanding (other than with the consent of the holder thereof), or (ii) in
> respect of a covenant or provision hereof or of another Operative Document
> which, under Article XII, cannot be modified or amended without the consent of
> each such affected Noteholder.

Indenture § 4.05.

31.     Here, the Trustee, on behalf of the Noteholders, has not sought to waive any Event of Default or rescind any purported acceleration (to the extent even necessary) because the Debtors have been paying regularly scheduled installments of principal and interest and have otherwise (to the best of the Trustee's and the Noteholders' knowledge) complied with the underlying Aircraft Agreements and Section 1110.  The Trustee thereby retains the right to waive any Event of Default, including any default resulting from the Debtors' filing for chapter 11 protection, such that said Event of Default would be deemed to have been "cured for every purpose of this Indenture."

### AMERICAN FILES FOR BANKRUPTCY AND AGREES TO CONTINUE PERFORMANCE UNDER THE AIRCRAFT AGREEMENTS

32.     On November 29, 2011 (the "Petition Date"), the Debtors filed voluntary petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors are authorized to continue to operate their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.

**Section 1110 of the Bankruptcy Code**

33.     The protections afforded to aircraft lenders under Section 1110 are some of the legal and financial underpinnings of the Notes Offering.  In offering the Notes to the market, American acknowledged that Section 1110 provides the aircraft lenders with "special rights" and that:

> In the case of Chapter 11 bankruptcy proceedings in which an air carrier is a debtor, Section 1110 provides special rights to holders of security interests with respect to "equipment" (as defined in Section 1110).  Section 1110 provides that, subject to the limitations specified therein, the right of a secured party with a security interest in "equipment" to take possession of such equipment in compliance with the provisions of a security agreement and to enforce any of its rights or remedies thereunder is not affected after 60 days after the date for the order for relief in a case under Chapter 11 of the Bankruptcy Code by any

13

provision of the Bankruptcy Code.  Section 1110, however, provides that the right
to take possession of an aircraft and enforce other remedies may not be exercised
for 60 days following the date of the order for relief (or such longer period
consented to by the holder of a security interest and approved by the court) and
may not be exercised at all after such period if the trustee in reorganization
agrees, subject to the approval of the court, to perform the debtor's obligations
under the security agreement and cures all defaults (other than a default of a kind
specified in Section 365(b)(2) of the Bankruptcy Code, such as a default that is a
breach of a provision relating to the financial condition, bankruptcy or insolvency
of the debtor).

Registration Statement at 43.  Furthermore, it was a condition to the closing of the Notes and the

purchase of these Notes by investors that American's General Counsel provide an opinion that

"if American were to become a debtor under Chapter 11 of the Bankruptcy Code, the Trustee

would be entitled to the benefits of Section 1110 with respect to the Airframe and Engines

comprising such Aircraft."  Id. at 44.

34.     Other provisions throughout the Aircraft Agreements make clear that the

protections afforded by Section 1110 were material to the offering of the Notes.  Indeed, among

other provisions, the Security Agreement states that "[i]t is the intention of the parties hereto that

the security interest created hereby, to the fullest extent available under applicable law, entitles

the Security Agent, on behalf of the Noteholders, to all of the benefits of Section 1110 with

respect to each Aircraft."  Security Agreement § 10.12.

**American Makes the Section 1110 Agreement and**
**Agrees to Perform All Obligations in Accordance with the Terms of the Indenture**

35.     In these cases, American filed a motion seeking to set procedures for it to make

agreements pursuant to Section 1110, well within the 60-day statutory period.  ECF No. 190

¶ 18.  American acknowledged that any voluntary agreement under Section 1110(a) would

"constitute the Debtors' agreement . . . to perform all obligations that become due under the

relevant Aircraft Agreement with respect to the Aircraft Equipment identified therein."  Id.

14

36.     On December 23, 2011, the Court entered an order permitting American to make agreements pursuant to Section 1110 (the "1110 Procedures Order").  See ECF No. 455. Pursuant to the 1110 Procedures Order, for aircraft to be subsequently identified by the Debtors, the Debtors were authorized to, among other things, (i) cure defaults, (ii) "perform all of their respective obligations under the certain Aircraft Agreements pursuant to Section 1110(a) of the Bankruptcy Code," and (iii) "make such payments arising under such Aircraft Agreements (including, without limitation, payment of rent or debt service and other contractually required payments)" with respect to the Aircraft Equipment identified by the Debtors.  See 1110 Procedures Order ¶ 5.

37.     In the 1110(a) Agreement, the Debtors made a postpetition agreement to "perform all obligations of the Debtors under the Aircraft Agreements with respect to the [Aircraft Equipment]," and "to cure any rent or debt service payments and other defaults, (other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code)."  See 1110(a) Agreement, p. 2.

38.     Because the Debtors made the 1110(a) Agreement before any debt service was required to be paid to the Noteholders during these chapter 11 cases, the Debtors were not required to make a debt service cure payment in order to enter into the 1110(a) Agreement.

39.     In accordance with the 1110(a) Agreement, the Debtors have made all regularly scheduled payments of principal and interest, at the non-default rate, that have come due under the Aircraft Agreements since the Petition Date.  Specifically, the Debtors made payments in the amounts of (i) $29,613,231.96 on February 1, 2012 and (ii) $28,012,228.43 on August 1, 2012. As of the Petition Date, the total outstanding principal amount owed under the Notes was $206,055,655.95.  As a result of the 1110(a) Agreement and the Debtors' postpetition payments

of regularly scheduled installments of principal and interest under the Notes, the current

outstanding principal amount (not including accrued interest) under the Notes is

$174,163,155.91.

40.     Prior to filing the Motion, American had never asserted that the Notes had been

accelerated.  American did not do so at the time of the initial bankruptcy, it did not do so at the

time that it made its election pursuant to section 1110, and it did not do so at any time after

making the 1110(a) Agreement.  American never attempted to re-negotiate the terms of the

Indenture pursuant to Section 1110(b) of the Bankruptcy Code in an effort to remove the

requirement to pay the Make-Whole Amount.  To the contrary, at all times prior to the filing of

the Motion, American represented that it had agreed to, and would comply with and perform all

obligations under, the Aircraft Agreements, which necessarily includes the requirement to pay

the Make-Whole Amount in connection with a Voluntary Redemption under Section 2.20 of the

Indenture.

**After Making the 1110(a) Agreement, American Continued to Perform Under the Aircraft
Agreements and Continue to Use and Enjoy the Aircraft for Its Benefit**

41.     Not surprisingly, the market reacted favorably to the announcement that

American had made the 1110(a) Agreement to perform all obligations under the Aircraft

Agreements.  For instance, on January 13, 2012, Standard and Poors announced that as a result

of American's agreement under Section 1110(a), it was removing the Notes from its

CreditWatch and raised the ratings on the Notes from "CCC+" to "B."  In so doing, Standard and

Poors wrote:

> American continued its pattern of affirming rated aircraft backed debt, which is
> secured mostly by new technology B737-800s and B777-200ERs that are core to
> the airline's fleet renewal plan.  The affirmation of debt for the 2011-1 and 2011-
> 2 pass-through certificates followed a like action on the similar 2009-1 certificates
> in December.  At that time, we judged prospects for affirmation of the 13% notes
> . . . somewhat less certain, because of the high coupon on the debt.  However, the

aircraft securing these notes are also important to American's fleet plan, and the
planes were secured under a single mortgage, so American could not selectively
turn back planes to creditors.

We raised our rating on the 13% notes because American's legally binding
commitment to perform on this obligation in bankruptcy mitigates near-term
default risk, and the lack of a liquidity facility is less important.  If, as we believe
likely, AMR and American reorganize and emerge from bankruptcy, we would
likely rate this obligation two notches above American's post-emergence
corporate credit rating, based on our criteria for (non-enhanced) equipment trust
certificates.

Standard & Poor's, Research Update: American Airlines 13% Notes Rating Raised to

'B', 2011-1 and 2011-2 Certificate Ratings Affirmed; All Off Credit Watch 2-3 (2012).

42.    After making the 1110(a) Agreement, American performed in accordance with

the terms of the Indenture.  In particular, as noted above, on February 1, 2012 and August 1,

2012, American paid $29,613,231.96 and $28,012,228.43, respectively, representing the

regularly scheduled payments of principal and interest on the Notes pursuant to the Aircraft

Agreements with respect to those Payment Dates.

43.    Upon information and belief, since making the 1110(a) Agreement, American has

continued to operate the Aircraft Equipment.  This continued use and enjoyment of the Aircraft

Equipment has benefitted American, as the operation of those aircraft has allowed American to

continue to operate profitable routes that are part of its network.

44.    Additionally, American never indicated, prior to the filing of its Motion, that it

believed that its bankruptcy filing allowed American to avoid obligations under the terms of the

Aircraft Agreements.  To the contrary, upon information and belief, American stated, during

discussions with certain Noteholders, that it was not in default and would continue to perform its

obligations under the Notes and the Aircraft Agreements.  Indeed, these discussions were

consistent with American's statements at the time the Notes were issued, including that making

17

an 1110(a) Agreement required the airline "to perform the debtor's obligations under the security agreement." Registration Statement at 43.

45.     The Noteholders have relied upon the 1110(a) Agreement to continue to perform pursuant to the terms of the Aircraft Agreements.  Upon information and belief, as a result of the 1110(a) Agreement, the Noteholders refrained from seeking relief from the automatic stay to enforce their rights to declare an acceleration.  Neither the Noteholders, nor the Trustee on their behalf, has sought relief to repossess the Aircraft Equipment, foreclose upon the Aircraft Equipment, or exercise other remedies.  Furthermore, as a result of the 1110(a) Agreement, certain Noteholders continued to hold their position in the Notes and others acquired positions in the Notes – actions that, upon information and belief, these Noteholders may not have taken but for American's 1110(a) Agreement and assurances with respect to its continued performance under the terms of the Aircraft Agreements.

46.     To the extent that the Notes could be said to have been "accelerated" as of the Petition Date, the 1110(a) Agreement and the Debtors' own actions have rendered the Notes decelerated.  Indeed, to allow the Debtors to make an affirmative postpetition 1110(a) Agreement, then perform under the operative Aircraft Agreements, as though no default had occurred, but later claim that the clock should be reset to before the Debtors' 1110(a) Agreement, would turn the purpose and intent of Section 1110 on its head and eviscerate the protections afforded to aircraft financing parties that Section 1110 was designed to protect.

**American Attempts to Effectuate a Voluntary Redemption of the Notes Through a Requested Refinancing, Without Payment of the Required Make-Whole Amount**

47.     Upon information and belief, notwithstanding American's entry into the 1110(a) Agreement to perform all obligations under the Aircraft Agreements, since the filing of these bankruptcy cases, American (or its affiliated entities) has been seeking to obtain new financing

18

to replace and redeem some, if not all, of its existing financings, including the Notes.  Indeed, in

its Motion, American represented that its desired new financing agreements are fully negotiated

other than the applicable interest rates and spreads.  Given this, it appears clear that American

has been surreptitiously working on obtaining this new financing, notwithstanding its 1110(a)

Agreement to continue performance under the Aircraft Agreements.

48.     Without any forewarning, and without contacting the Trustee or any of the

Noteholders, on October 9, 2012, American filed its Motion seeking authorization to refinance

certain of its aircraft financing, including the Notes.  See ECF No. 4959.  The vast majority of

the Motion focuses on attempting to explain why the new financings would benefit American, by

allowing it to take advantage of the currently prevailing lower interest rates.  See id. ¶¶ 10-18,

24-25, 29-30.  The Debtors could not have stated the reasons why they are seeking the relief

requested in the Motion at this time more clearly.  They note that "[i]nterest rates available in the

EETC financing market are currently at historic lows," that the Debtors must "proceed with an

EETC financing as soon as possible to take advantage of current market conditions," and that the

interest expense savings associated with the proposed transaction would be "well in excess of

$200 million."  See Motion ¶¶ 10, 11, 13.

49.     On October 23, 2012, the Trustee filed its Objection to the Motion.  See ECF No.

5086 (the "Objection").  Prior to filing the Objection and initiating this adversary proceeding,

counsel to the Trustee spoke with counsel to the Debtors and explained that the Trustee believed

that American could not effectuate a refinancing and redeem the Notes without payment of the

Make-Whole Amount.  Counsel for the Debtors disagreed.  Accordingly, and in light of the

importance of the issues to the Noteholders, the Trustee, after receiving instructions from a

majority of the Noteholders, was forced to bring this proceeding seeking a declaration of the

parties' rights and obligations.

### FIRST CLAIM FOR RELIEF
**(Declaratory Judgment that American's Requested Refinancing Constitutes a Voluntary Redemption For Which Payment of the Make-Whole Amount Is Required)**

50.     Plaintiff repeats, re-alleges, and incorporates the allegations set forth in

Paragraphs 1 through 49 as if fully set forth herein.

51.     This claim for relief arises under the Federal Declaratory Judgment Act, 28

U.S.C. § 2201.

52.     An actual and justiciable controversy exists among the Plaintiff and the Defendant

with regard to whether by seeking to refinance the Notes, American is seeking a Voluntary

Redemption pursuant to the terms of the Indenture.  Further, an actual and justiciable controversy

exists as to whether American is liable for the Make-Whole Amount on account of its Voluntary

Redemption as a result of the refinancing.  These issues are ripe for adjudication.

53.     Upon information and belief, American contends that it is entitled to avoid

payment of the Make-Whole Amount notwithstanding its proposal to refinance the Notes prior to

the Maturity Date.  However, the Indenture expressly requires American to pay the Make-Whole

Amount should it redeem the Notes prior to the Maturity Date.

54.     The Court should enter a judgment declaring that by virtue of the refinancing

sought by American, a Voluntary Redemption will occur under the terms of the Indenture.  The

Court should also enter a judgment declaring that, pursuant to the terms of the Indenture,

American has agreed to make a Voluntary Redemption and is required to pay the Make-Whole

Amount.

**SECOND CLAIM FOR RELIEF**
**(Declaratory Judgment that American's Agreement Pursuant to 11 U.S.C. § 1110 and**
**Subsequent Performance Under the Terms of Indenture Constitutes an Agreement By**
**American to Continue to Perform All Obligations In Accordance with the Terms of the**
**Indenture)**

55.     Plaintiff repeats, re-alleges, and incorporates the allegations set forth in

Paragraphs 1 through 54 as if fully set forth herein.

56.     This claim for relief arises under the Federal Declaratory Judgment Act, 28

U.S.C. § 2201.

57.     An actual and justiciable controversy exists among the Plaintiff and the Defendant

with regard to whether American, by virtue of its election under Section 1110 and the 1110(a)

Agreement, entered into an agreement to perform its obligations under the Indenture or if

American can nevertheless invoke its initial bankruptcy filing as an Event of Default that could

permit it to avoid its obligations under the Indenture.  This issue is ripe for adjudication.

58.     Upon information and belief, American contends that the Notes were

automatically accelerated at the initiation of the chapter 11 cases and that, therefore, it is entitled

to avoid payment of the Make-Whole Amount, notwithstanding the Voluntary Redemption of the

Notes by American.  However, by virtue of the 1110(a) Agreement, American precluded the

Noteholders from seeking remedies by virtue of American's bankruptcy filing, including

precluding repossession or foreclosure on the underlying aircraft or an acceleration of the

principal and interest owing under the Notes.  Furthermore, by virtue of the 1110(a) Agreement,

and its conduct thereafter, American manifested its agreement to continue to perform pursuant to

the terms of the Indenture, which terms include the provisions governing a Voluntary

Redemption and the required payment of the Make-Whole Amount.

59.     The Court should enter a judgment declaring that American, by virtue of the

1110(a) Agreement and its conduct thereafter, cannot rely on automatic acceleration caused by

the bankruptcy filing to avoid its obligations arising under the Indenture since the bankruptcy

filing and the 1110(a) Agreement.

**THIRD CLAIM FOR RELIEF**
**(Declaratory Judgment that the Indenture's Automatic Acceleration Clause Is an**
**Unenforceable *Ipso Facto* Clause)**

60.     Plaintiff repeats, re-alleges, and incorporates the allegations set forth in

Paragraphs 1 through 59 as if fully set forth herein.

61.     This claim for relief arises under the Federal Declaratory Judgment Act, 28

U.S.C. § 2201.

62.     An actual and justiciable controversy exists among the Plaintiff and the Defendant

with regard to whether the provisions of the Indenture that purport to cause an automatic

acceleration of the Notes upon the filing of these Bankruptcy cases are enforceable under the

Bankruptcy Code.  This issue is ripe for adjudication.

63.     The Debtors assume that the *ipso facto* clause in the Indenture, which provides for

the acceleration of the Notes upon the Debtors' filing for bankruptcy, is enforceable against the

Debtors under bankruptcy law.  However, the Bankruptcy Code restricts the enforcement of *ipso*

*facto* clauses that provide for the termination of an agreement or the acceleration of a

counterparty's rights under an agreement or loan upon a party's filing for bankruptcy.

64.     The Indenture's *ipso facto* acceleration clause is also rendered unenforceable

pursuant to Section 1110, which specifically provides secured lenders with a right of

repossession if the debtor does not agree to perform all of its obligations, or fails to cure all

defaults**,** other than the types of default "specified in section 365(b)(2)."  Section 1110 thereby

specifically identifies those defaults enumerated in section 365(b)(2), which include a default

relating to "the insolvency or financial condition of the debtor at any time before the closing of

the case," as the types of default that a debtor cannot cure under Section 1110.

22

65.     The Court should enter a judgment declaring that the Indenture's automatic

acceleration clause is an unenforceable *ipso facto* clause.

## FOURTH CLAIM FOR RELIEF
**(Declaratory Judgment that American's Agreement Pursuant to 11 U.S.C. § 1110 and
Subsequent Performance Under the Terms of Indenture Had the Effect of Decelerating the
Notes)**

66.     Plaintiff repeats, re-alleges, and incorporates the allegations set forth in

Paragraphs 1 through 65 as if fully set forth herein.

67.     This claim for relief arises under the Federal Declaratory Judgment Act, 28

U.S.C. § 2201.

68.     An actual and justiciable controversy exists among the Plaintiff and the Defendant

with regard to whether American's filing for bankruptcy caused an acceleration of the Notes,

and, if it did, whether American's entry into the 1110(a) Agreement caused a deceleration of the

amounts due under the Notes.  This issue is ripe for adjudication.

69.     Upon information and belief, American contends that its bankruptcy filing caused

all amounts due under the Indenture to be accelerated.  However, by virtue of its entry into the

1110(a) Agreement, American agreed to perform its obligations under the terms of the Indenture.

Thereafter, American made regularly scheduled payments of principal and interest, thereby

performing under the regular terms of the Indenture as if no acceleration or default had occurred.

Accordingly, American's election and its subsequent performance caused a deceleration of any

amounts of the Notes.

70.     The Court should enter a judgment declaring that, to the extent the Notes were

deemed to be automatically accelerated under the Bankruptcy Code, American's 1110(a)

Agreement and its subsequent performance (including payment of the regularly scheduled

principal and interest due on the Notes in accordance with the amortization schedule under the

Aircraft Agreements), had the effect of decelerating the Notes.

## FIFTH CLAIM FOR RELIEF
### (Declaratory Judgment that the Trustee and the Noteholders Are Entitled to Waive Acceleration and Any Events of Default)

71.     Plaintiff repeats, re-alleges, and incorporates the allegations set forth in

Paragraphs 1 through 70 as if fully set forth herein.

72.     This claim for relief arises under the Federal Declaratory Judgment Act, 28

U.S.C. § 2201.

73.     An actual and justiciable controversy exists among the Plaintiff and the Defendant

with regard to whether the Noteholders are entitled to exercise their rights under the terms of the

Indenture to waive any purported acceleration or any alleged Events of Default.  This issue is

ripe for adjudication.

74.     Under the terms of the Indenture, a majority of the Noteholders can direct the

Trustee to waive any Events of Default or have the Trustee decelerate any accelerated amounts

due under the Notes.  Upon information and belief, American contends that the filing of

bankruptcy precludes the Noteholders from exercising their rights to direct the Trustee to waive

any Events of Default and/or decelerate amounts due.

75.     However, contrary to American's view, the bankruptcy filing does not preclude

the Noteholders from exercising their contractual rights under the terms of the Indenture.

Moreover, by virtue of American's election and it having entered into the 1110(a) Agreement,

American agreed to perform in accordance with the terms of the Indenture, which necessarily

includes the rights of the Noteholders to direct the Trustee to waive any Events of Default and/or

to decelerate any amounts due under the Notes.

76.    Additionally, to the extent the Debtors violate the 1110(a) Agreement, and fail to pay any amounts due under the Notes, the stay will no longer apply and the Trustee can take enforcement actions in accordance with section 1110(a)(2)(B)(iii) and 1110(c)(1).

77.    The Court should enter a judgment declaring that, if there was an acceleration in the present circumstances without any action by the Trustee under the Indenture (and the Trustee respectfully submits there was not), pursuant to the terms of the Indenture, the Trustee and the Noteholders are entitled to rescind any such acceleration and/or waive any Events of Default.

## SIXTH CLAIM FOR RELIEF
### (Declaratory Judgment that American Is Equitably Estopped From Refusing to Perform Under the Terms of the Indenture)

78.    Plaintiff repeats, re-alleges, and incorporates the allegations set forth in Paragraphs 1 through 77 as if fully set forth herein.

79.    This claim for relief arises under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

80.    An actual and justiciable controversy exists among the Plaintiff and the Defendant with regard to whether in seeking to refinance the Notes, American is liable under the terms of the Indenture to pay the Make-Whole Amount required by the Indenture.  This issue is ripe for adjudication.

81.    Through the 1110(a) Agreement, American represented that it would perform pursuant to the terms of the Aircraft Agreements.  At no point prior to the filing of its Motion did American ever disclose that it intended to refinance the Notes and utilize its initial bankruptcy filing as a purported justification to avoid the payment of the Make-Whole Amount required by the Indenture.

25

82.     Additionally, neither at the time of the bankruptcy filing, nor at any time within the 60 day period established by Section 1110, did American ever claim that an acceleration of the debt underlying the Notes had occurred.  Nor did American offer to pay the outstanding principal and accrued interest but not the Make-Whole Amount.  Instead, through the 1110(a) Agreement and subsequent conduct, American demonstrated its belief that, at the time of the bankruptcy filing, the Notes had not been accelerated.  Indeed, American affirmatively represented through the 1110(a) Agreement that it had, and would continue to, remedy all defaults, other than those specified in section 365(a)(2) of the Bankruptcy Code, that existed at that time.

83.     Additionally, through its conduct, American performed as if no acceleration had occurred upon the filing of the bankruptcy cases.  Indeed, after entering into the 1110(a) Agreement, American made regularly scheduled principal and interest payments pursuant to the schedule set forth in the Indenture as if no acceleration had occurred.

84.     The Noteholders justifiably relied to their detriment upon American's 1110(a) Agreement, including American's representations that it would perform all obligations in accordance with the terms of the Indenture and American's subsequent performance in accordance with the terms of the Indenture as if no acceleration had occurred.  Upon information and belief, had the Noteholders known of American's intention to effectuate a refinancing without payment of the Make-Whole Amount, the Noteholders may have taken actions including, but not limited to, attempting to lift the automatic stay and to seek other remedies for American's intended Voluntary Redemption of the Notes.

85.     The Court should enter a judgment declaring that American, by virtue of the 1110(a) Agreement and its conduct thereafter, is equitably estopped from denying the

26

enforceability of the terms of the Indenture, including the provisions requiring payment of the

Make-Whole Amount as a result of the Voluntary Redemption of the Notes by American.

86.    Furthermore, the Court should declare that, by virtue of the 1110(a) Agreement

and American's conduct thereafter, American is equitably estopped from relying upon a

purported acceleration by virtue of the initiation of these bankruptcy cases, and should preclude

any effort by American to claim that it is entitled to a release of the liens on the aircraft securing

the Notes absent the payment of the Make-Whole Amount.

**SEVENTH CLAIM FOR RELIEF**
**(Declaratory Judgment that the Make-Whole Amount is a Secured Obligation Under the**
**Terms of the Indenture)**

87.    Plaintiff repeats, re-alleges, and incorporates the allegations set forth in

Paragraphs 1 through 86 as if fully set forth herein.

88.    This claim for relief arises under the Federal Declaratory Judgment Act, 28

U.S.C. § 2201.

89.    An actual and justiciable controversy exists among the Plaintiff and the Defendant

with regard to whether the Make-Whole Amount is a Secured Obligation under the terms of the

Indenture.  This issue is ripe for adjudication.

90.    Upon information and belief, American contends that the Make-Whole Amount is

not a Secured Obligation under the terms of the Indenture.  However, all amounts due and owing

under the Indenture are secured by liens on certain aircraft operated by American, including any

Make-Whole Amount owed by American by virtue of a Voluntary Redemption of the Notes.

91.    The Court should enter a judgment declaring that, pursuant to the terms of the

Indenture, American has agreed to make a Voluntary Redemption and is required to pay the

Make-Whole Amount, which is a Secured Obligation under the Indenture.

WHEREFORE, the Plaintiff demands that upon a final determination by this Court, judgment be entered in its favor and against American, as follows:

A.      Declaring that, to the extent that American obtains new aircraft financing for the Aircraft Equipment, a Voluntary Redemption has occurred under the Aircraft Agreements and that American is thereby required to pay the Make-Whole Amount;

B.      Declaring that American's 1110(a) Agreement and its subsequent performance, including its regularly scheduled payments of principal and interest on the Notes, constituted an agreement to perform all obligations in accordance with the terms of the Aircraft Agreements, the terms of which require payment of the Make-Whole Amount in connection with the proposed refinancing;

C.      Declaring that the Indenture's automatic acceleration clause is an unenforceable *ipso facto* clause;

D.      Declaring that, to the extent the Notes were deemed to be automatically accelerated under the Bankruptcy Code, American's 1110(a) Agreement and subsequent performance (including the payments of regularly scheduled principal and interest due on the Notes in accordance with the amortization schedule under the Aircraft Agreements), had the effect of decelerating the Notes;

E.      Declaring that, even assuming there had been an acceleration in the present circumstances without any action by the Trustee under the Indenture (which is not the case), pursuant to the terms of the Indenture, the Trustee and the Noteholders are entitled to rescind any such acceleration against the Debtor and/or waive any Events of Default and consequences thereof;

28

F.     Declaring that American is equitably estopped from refusing to perform all obligations in accordance with the terms of the Aircraft Agreements, including from refusing to pay the Make-Whole Amount should American attempt to redeem or otherwise refinance the Notes prior to the Maturity Date;

G.     Declaring that the Make-Whole Amount is a Secured Obligation under the Indenture;

H.     Awarding Plaintiff its costs, expenses and reasonable attorneys fees, both at trial and on appeal, in addition to all other sums allowed by law; and

I.     Granting Plaintiff such other and further relief as the Court deems just and appropriate.

Dated: New York, New York
          November 7, 2012

SIDLEY AUSTIN LLP

By:     /s/ Michael G. Burke_____
          Michael G. Burke, Esq.
          Nicholas K. Lagemann, Esq.
          Erica S. Malin, Esq.
          Noam M. Besdin, Esq.
          787 Seventh Avenue
          New York, NY 10019
          (212) 839-5300 (tel)
          (212) 839-5599 (fax)

          – and –

          SHIPMAN & GOODWIN LLP
          Ira H. Goldman, Esq.
          Kathleen M. LaManna, Esq.
          Corrine L. Burnick, Esq
          One Constitution Plaza
          Hartford, Connecticut 06103-1919
          Telephone: (860) 251-5000
          Facsimile: (860) 251-5218

          *Counsel to U.S. Bank Trust National Association, as Trustee for the American Airlines, Inc. 2009-2 Secured Notes Due 2016*

29